Argued April 30, affirmed September 3, 1976

PECK, *Respondent,*

*v.*

SECURITY BANK OF OREGON, *Appellant.*

554 P2d 505

*Robert J. Miller* of Black, Kendall, Tremaine, Boothe & Higgins, Portland, argued the cause and filed briefs for appellant.

*Glenn H. Prohaska* of Day & Prohaska, P.C., Portland, argued the cause and filed a brief for respondent.

Before O'Connell,\* Chief Justice, and McAllister, Denecke,\*\* and Howell, Justices.

McALLISTER, J.

---

\*Chief Justice when case was argued.
\*\*Chief Justice when case was decided.

## McALLISTER, J.

Plaintiff, Jay R. Peck, brought this action against the Security Bank of Oregon for damages for breach by the bank of an agreement to sell him certain real property. The case was tried by the court without a jury and plaintiff was awarded a judgment in the sum of $45,000. Defendant appeals.

Prior to April 1973 Security Bank acquired title to the Regency Hotel in Portland by foreclosure. After waiting for the redemption period to expire, the bank contracted to sell the hotel, but had to foreclose again because the venture was unprofitable for the new owner.

Again, prior to April 1973, but after the second foreclosure, the State Banking Commissioner advised the bank that it would have to either write off three-fifth's of the value of the hotel during 1973 or sell the hotel in order to comply with a statute requiring divestiture of foreclosed property within five years. The three-fifth's write-off would have amounted to about $250,000 and would have impaired the bank's ability to issue dividends for that year.

About mid-April 1973 an officer of the bank talked to plaintiff Jay Peck about buying the hotel. Mr. Peck was a broker and speculator who did considerable business with the bank. The officer wanted Peck to consider a joint venture with Boardman Development Co. for purchase of the hotel.

On April 17, 1973 Peck and Boardman Development Co., as buyers, entered into a written earnest money agreement for the purchase of the hotel from the bank. The sale price was $670,000 and the buyers paid $10,000 to the defendant as earnest money. The earnest money agreement provided in pertinent part as follows:

"Seller shall obtain an MAI appraisal from a reputable firm to be paid for by the Purchaser. Purchaser shall provide Seller with a takeout by a suitable lender committing themselves to a loan of not less than 80% of

the value placed on the property by a suitable MAI appraiser. *Purchaser shall deliver said takeout within 30 days from the date of receiving the MAI appraisal.* Should Purchaser fail to provide Seller with satisfactory evidence of a commitment to finance within said 30 days, Purchaser shall forfeit the earnest money as liquidated damages, and this contract thereupon shall be of no further binding effect." (Emphasis added.)

On May 23, 1973 the bank obtained the MAI appraisal and delivered it to Peck. The purchasers were, therefore, obligated to secure a takeout loan commitment by June 23, 1973 and, if they failed, the $10,000 earnest money would be subject to forfeiture.

On or about June 1, 1973 Peck advised the bank that he and Boardman Development Co. were unable to obtain financing from any source and apparently would have to forfeit their $10,000 earnest money. Under those circumstances the bank could have, on June 23, 1973, terminated the contract and declared the earnest money forfeited. However, Peck asked the bank to provide financing for the purchase of the hotel by plaintiff and to give the plaintiff more time to make the purchase. The defendant did not declare a forfeiture of the $10,000 earnest money and did agree to lend $600,000 to the plaintiff for the purchase of the hotel. Peck agreed to pay a loan fee of two per cent, or $12,000.

It was apparently understood that Peck did not intend to purchase and operate the hotel, but was merely buying it as an investment for resale. Peck's intention was to have a buyer ready when he completed the purchase of the property from the bank. Peck was given an indefinite extension of time in which to obtain the balance of the purchase price. The bank was apparently willing to extend the time as long as Peck continued his efforts to sell the hotel.

Peck signed a $600,000 note to the defendant and a mortgage on the hotel. These documents were deposited in escrow.

On June 17, 1973 Boardman Development Co.

assigned to the plaintiff all of its rights in the earnest money agreement.

During the next four months Peck attempted to raise the balance of the purchase price by selling the hotel bar and restaurant. He was also negotiating with several individuals for a resale of the hotel. It appeared that Peck was financially able to complete the purchase of the hotel at any time. However, Peck apparently wanted to have a firm deal to resell the hotel before concluding his purchase of the hotel from the bank.

It appeared from the minutes of the September 18, 1973 meeting of the board of directors of the bank that the bank was satisfied with the progress of Peck's efforts to sell the hotel. On September 19, 1973 the bank executed an extension agreement postponing the due date of the first payment on the $600,000 loan from September 1 to November 1, 1973.

On September 20, 1973 another prospective purchaser, Oceanlake Estates, Inc., inquired of the bank about the property. On October 19, 1973 Oceanlake Estates made an oral offer to purchase the hotel and on November 14, 1973 the hotel was sold to Oceanlake Estates without any notice to Mr. Peck.

Upon hearing of the sale Peck attempted to obtain a refund of his $10,000 earnest money, but was unsuccessful.

On November 26, 1973 Security wrote to the escrow agent and asked for forfeiture of the plaintiff's earnest money, which it received from the escrow holder. The current litigation then followed.

The trial court found that Security had breached its contract, as modified, with Peck. The trial court found that the value of the hotel at the time of the breach was $705,000, or $35,000 more than the contract price. Plaintiff's judgment included that $35,000 plus the $10,000 earnest money.

The plaintiff, in his complaint, alleged that:
"* * * *the agreement was modified in that in consider-*

[ 65 ]

*ation of a 2% loan fee in the sum of $12,000.00, the defendants agreed to loan plaintiff the sum of $600,000.00 in lieu of the provision contained in Exhibit 'A' [the Earnest Money Receipt] that plaintiff would obtain an 80% take-out loan thirty days after the MAI appraisal was received."*

The plaintiff contends, as alleged, that the earnest money agreement was modified by the agreement by the bank to loan plaintiff $600,000 to help plaintiff finance purchase of the hotel. Plaintiff further contends that his agreement to pay a loan fee of two per cent of the loan, or $12,000, was valid consideration for the modification.

On the other hand, the bank assumes that the earnest money agreement was modified by its agreement to loan plaintiff $600,000, but contends that there was no consideration for the modification and that it was, therefore, invalid. Plaintiff himself testified that he was not obligated to pay the $12,000 loan fee unless he borrowed the $600,000 and that he could limit his loss to a forfeiture of his earnest money if he chose to do so.

The parties devote a large portion of their briefs to the dual question of whether the earnest money receipt was modified and, if so, whether there was a valid consideration for the modification.

In our view the issues of modification and consideration therefor are not the controlling issues in this case. The controlling fact is that the earnest money agreement remained in effect as the basic document determining the rights of the parties. The bank agreed to sell the hotel to plaintiff for $670,000 and that obligation was not impaired by the assumed modification.

Whether the agreement by the bank to loan plaintiff $600,000 to help plaintiff finance the purchase was a modification and whether or not it was supported by a valid consideration are of little consequence. It is undisputed that the bank gave plaintiff an unlimited extension of time to complete the purchase of the hotel

and there is no evidence that the plaintiff was obliged to use the loan from the bank with which to finance the purchase.

■ We have a case in which the bank, as seller, agreed to sell, and plaintiff, as purchaser, agreed to buy the hotel for $670,000 and pay the bank $10,000 earnest money, to be forfeited if he did not complete the purchase. The only effect of the assumed modification was to extend the time for performance and to provide a source from which plaintiff could obtain a large portion of the purchase price.

■ The law is firmly settled that a vendor who waives prompt performance of the payment of the purchase price under a land sale contract and grants the purchaser an indefinite extension of time within which to perform must, before he can declare a forfeiture (1) give notice to the purchaser that he intends in the future to require prompt performance of the contract, and (2) give the purchaser a reasonable time within which to perform. The applicable rule is stated in *Johnson et al v. Berns et al,* 111 Or 165, 173, 209 P 94, 224 P 624, 225 P 727 (1924), as follows:

> "The principle is that all the terms of the contract are binding upon all the parties thereto and that if the vendor, for whose benefit the stipulation about time being of the essence of the contract is made, would insist upon it, he must act promptly upon that provision so that any indulgence upon his part will amount to a nullification of that feature of the covenant. In effect, by operation of law upon his indulgence, a new contract is brought into existence for the time being, from which that clause is absent, and it so remains in this modified form until by reasonable notice to the opposite party that it will thereafter be insisted upon, the agreement between the parties is restored to its original form. Until thus reinstated by reasonable notice the seller cannot suddenly and without fair notice, pounce upon the purchaser, oust him from possession, and cancel his rights under the contract. * * *"

*See, also, Grider v. Turnbow,* 162 Or 622, 641, 94 P2d 285 (1939); *Rynhart v. Welch,* 156 Or 48, 53, 65 P2d 1420 (1937).

[ 67 ]

In *Stinemeyer v. Wesco Farms, Inc.,* 260 Or 109, 115, 487 P2d 65 (1971), we held that the general rule applying to attempted forfeitures also applies when the vendor is seeking to foreclose a land sale contract. *See, also, Lee v. Wood Products Credit Union,* 275 Or 445, 448, 551 P2d 446 (1976); *Fisher v. Tiffin,* 275 Or 437, 440, 551 P2d 1061 (1976); *Soltis v. Liles,* 275 Or 537, 542-543, 551 P2d 1297 (1976).

Although the cited cases deal with contracts providing for instalment payments, we think they are equally applicable to contracts which provide for payment of the full purchase in one payment.

The trial court did not err in holding that the bank breached the contract by declaring a forfeiture without giving notice to plaintiff, demanding performance, and giving him a reasonable time within which to perform.

■ The bank further contends that if the plaintiff is entitled to recover damages, the judgment should be reduced by the amount of the $12,000 loan fee which plaintiff agreed to pay if he borrowed the $600,000 from the bank. The bank relies on Restatement of Contracts, § 335, which reads:

> "If the defendant's breach of contract saves expense to the plaintiff by discharging his duty of rendering a performance in return or by excusing him from the performance of a condition precedent, the amount of this saving is deducted from the damages that would otherwise be recoverable."

We think the above rule is not applicable to this case because the plaintiff was not obliged to borrow the $600,000 from the bank, but could have, if given reasonable notice by the bank, paid the purchase price from other sources. If the plaintiff had been legally obligated to finance the purchase only by borrowing the $600,000 from the bank, the rule quoted above may have been applicable.

Finding no error in the judgment, it is affirmed.